at all, or arguments not to exceed 15 minutes per side. Mr. Dennis Bila II for the Plaintiffs at Home. Good morning, Your Honor. Dennis Bila, appearing for DAGS and G2BK. I would like to reserve five minutes for rebuttal with the Court's The Code of Federal Regulations defines market value as what we learned in law school. It's what an arms-length buyer would pay an arms-length seller for a particular piece of real property under reasonable circumstances, and the money shall be paid in U.S. dollars. Michigan's statutory foreclosure process provides a remedy for lenders to recoup property very quickly and without having to go to court. Because it allows for this quick remedy and it does not require that the lender go to court, it provides some safeguards to the borrower. The safeguards are that an auction shall be held in which lenders can come in and fairly bid what they believe is the market value for the property being sold. If the property is undersold at this auction, the statutory foreclosure process allows the borrower the right to redeem. So if the lender underbids, the borrower can go in and redeem, and the borrower demonstrates later at trial when the lender is trying to collect on the note that the lender underbid, the borrower is given credit for the difference between the bid amount and market value. The question in this case, and I believe had Huntington acted alone and not formed 14 Corporation, we would have applied without question. And when Huntington foreclosed on its junior mortgage, its senior mortgage would have merged and been wiped out by law under the Rensen case. So therefore, when it bid the $1.8 million at the foreclosure sale, the borrower could have bid $1.8 million or assigned his mortgage for the $1.8 or the $5.5 that the affidavit suggested they were willing to pay. But what happened here is Huntington acted in concert with its solely owned, totally controlled subsidiary, 14 Corp. As you'll see in our brief, they admitted in responses to discovery requests that they formed 14 Corp. and not the market value of the property and not the redemption amount bid, but they did this for the sole purpose of getting around the statutory foreclosure process to make it unfair. Because when 14 Corp. goes in to bid on a $5.5 million piece of property, there can be no competitive bidders if those bidders take subject to a first mortgage. So the other people didn't know the amount of the first mortgage? No, because the mortgages were cross-collateralized and they secured, as many commercial mortgages do, all debt past, present, future. So the only way to get the debt would be out of Huntington, the true debt amount. And that wasn't known. Huntington published the debt for the second mortgage and they published that in So any bidder who comes in and bids on the second mortgage takes subject to the first. So no competitive bidding could have occurred in this case. Now, the trial judge found as much. The trial court concluded that Huntington and 14 Corp. did act in concert. He found that there was no harm done because while he said there was a amount, the market value of the property, and that he couldn't make that determination, a few sentences later he said, I am going to make that determination and I'm going to conclude that the market value of the property was $500,000 more than they bid because that's the amount they sold it for. That is not the definition of the market value as defined by the Code of Federal Regulations, 34.42G. Why does the Code of Federal Regulations apply in this Michigan case? Market value is a defined term in the law. So when you look to what the market value is, you can go to a number of sources. You can go to the Code of Federal Regulations and find out what market value is for federally insured loans or loans from federally insured banking institutions. Or you can go to the Horn Books, which is basically the same definition. Market value is what a reasonable buyer would pay a reasonable seller under fair and reasonable circumstances. What Huntington would like this court to accept is that while their appraisal said the value of the building was in excess of $4 million, the market value is defined in their appraisal, and we cited the specific reference in our brief. We believe it was worth 5.5. The trial judge said it was worth 2.3. Huntington bought it for 1.8, but under a contrived valuation. They told the appraiser, appraised it for market value, and the appraiser did and came up with in excess of $4 million. So then Huntington went back and directed the appraiser to do it on a rush, liquidated, fireside sale with a bunch of contrived definitions. Pinning the appraiser down, if we had to sell this in, you could go to the extreme and say if we had to sell this in 5 minutes, what would the value be? It would be substantially less than 1.8 million. If we have to sell it in 30 days, what would the value be? It might be 1.8 million. If we put it up for sale in a reasonable marketing period, which the appraiser for Huntington that Huntington hired said a reasonable marketing period would have been 12 to 18 months, under that basis we come up with a value of 4.2 million. Huntington does. Our buyers, we submitted uncontradicted, uncontroverted affidavits to the trial court, suggesting that several bidders were willing to bid in excess of $5 million, but for the fact that they couldn't find out the value of the first mortgage and couldn't bid and take subject to that first mortgage. And I think it's critical that the trial judge came to that same conclusion. The trial judge concluded, as a matter of law, that Huntington underbid, or that 14 Corp underbid. What he did then is made a factual finding without a trial and without any evidence and said, I don't believe there's a reasonable dispute as to the value of the property because we know what it's sold for. Whether Huntington... Would the district judge, if we were to take your position and remand to the district court for proper fact finding, would it be the district judge making that decision or would there be a jury? I don't recall in this case if we had a jury. No, we do not have a jury demand. So it would be the district judge, after hearing evidence. That's the difference, that there would be an evidentiary hearing where everybody could put in their evidence as to what the value is. Correct. We could go over with him in greater detail what the appraiser thought the market value was as opposed to a liquidation value. And there isn't all that evidence in front of him on the summary judgment? The appraisal is absolutely in and the valuations submitted by the affidavits are absolutely there. That's correct. He was not able to assess the credibility of the witnesses, which I think is critical for a trier of fact to do. The trial judge, if he concludes as a matter of law that there's an issue for the trier of fact, then he should allow the witnesses to come in and give their testimony as to what the appraisal means, the market value versus the liquidated value, what other bidders would come in and testify what the market value was in their opinion, so that he can make a proper factual determination as to the market value based on the evidence and the credibility of the witnesses. So it's our position that 14 Corp., as a wholly owned subsidiary, and I understand you read the brief so I don't want to go deeply into it, as a wholly owned subsidiary acting at the sole discretion of Huntington, was really one and the same. And so Huntington and 14 should be viewed as one so that the Rensen case should apply and the first mortgage should have been extinguished when they bid on the second. Thank you. If there are no questions. Okay, thank you. If it please your honors, Jeff Raffleson of Detroit on behalf of Huntington National Bank and 14 Corporation. I'd like to begin by making sure we have perspective on what it is the appellants, plaintiffs in this case, are trying to do. As they point out in their brief, Mr. Scott Bosgraf was the driving force behind Baker Laws. He's the one who put into effect all the events, many of the events that were before your honors. They acknowledge that after the foreclosure they're challenging here, over $3 million of indebtedness had not been repaid. They also acknowledge in footnote 10 of their reply brief that there's an additional $15 million on other projects still not repaid. By Mr. Bosgraf's various entities. And yet in this action they're trying to say because 14 Corporation foreclosed on a junior mortgage while Huntington held a senior mortgage, all the Baker Laws indebtedness is wiped out. That any further collection activity was conversion for which Huntington Bank and 14 Corporation now owe him treble damages. That's the audacity. But if it were Huntington instead of 14 who had foreclosed the second mortgage, then that $3 million wouldn't be wiped out, right? No, it wouldn't. No? That's a misapplication of the Rensen case. And I would like to talk about that. I know I'm not allowed to reserve time, but there's a very important subject I need to get to on the piercing the veil analysis, which wasn't really covered much in Mr. Beal's. So please give me the time to do that. The Rensen case doesn't stand for the proposition that the indebtedness gets wiped out. Let's remember what happened in the Rensen case. The Rensen case was designed to prevent double recovery when the lender has already recovered real estate in excess of its bid amount. The lender in Rensen loaned $1.1 million to the borrower, secured by a mortgage and a note. Then loaned $500,000 to the borrower, secured by a separate note and a separate mortgage. They weren't cross-collateralized. There was no dispute in the Rensen case that the property was worth $3 million, well in excess of the $1.6 million total indebtedness. That's why the indebtedness got wiped out in Rensen. It has awkward language, but if you look at the Rensen case, it's struggling with the inapplicability of MCL 600.3280. And appellants completely misstate what that statute provides in their brief. Although Mr. Beal accurately stated it in an oral argument. If you obtain property at a foreclosure sale for less than its fair value, and then the lender proceeds against you for deficiency, you're entitled to credit for that fair value, not cancellation of the indebtedness. And so that penalty doesn't exist. At most, what would have happened here is if Huntington had held all the mortgages and done all the foreclosing, and they could raise an issue of fact, which we contend they have not done, and I'd like to explain that too, as to whether Huntington bid the fair value, then they would be entitled to the credit for the fair value. And that's approximately what Judge Bell tried to do. The appellant's position on that part of it, and again this is way down the line, is that they're seeking to impose the requirement of a determination that isn't required. Judge Bell was exercising his equitable jurisdiction. He was expressly not applying rent-sent, so there was no need for the determination he made to have been made as of the time of the foreclosure sale. What he expressly said in his opinion was, I find that through the use of dividends from 14 Corporation flowing up to Huntington, it got the benefit of the higher price 14 Corporation later sold the property for, and I'm going to give plaintiffs, appellants, credit for that amount. That's an exercise of equitable jurisdiction, or equitable decree, that's subject to an abuse of discretion standard, and does not have to follow the timing requirements appellants seek to impose upon them. If I could digress for just one minute to talk about piercing the corporate veil. That's where this case ends. Judge Bell ruled as a matter of law, they had failed to present evidence of fraud or illegality in the design of 14 Corporation, which is a necessary requirement of Michigan law. In their reply brief, it's very, very clear that they're relying on the CMS Energy case for the proposition that that isn't an element of Michigan law. Regrettably, neither side cited to this court a subsequent CMS Energy case, Dutton Partners versus CMS Energy, 290 MISH Act 635, decided in 2010, which said that their interpretation of CMS Energy is exactly wrong. I'd like to read a few selections from pages 644 through 646 of that opinion, because it couldn't be clearer that they're wrong on their position that Michigan law does not have such a requirement. Significantly, plaintiff does not identify in his brief on appeal any evidence of fraud, wrongdoing, or misuse. Rather, it simply argues that Michigan law does not require such a showing in order for a parent corporation to be held liable for the acts of its subsidiary. We disagree. Plaintiff has cited no binding authority for its proposition that is sufficient to show merely that CMS and consumers are alter egos. Further, defendants reliance on CMS Energy versus Attorney General, the case they're citing, is unavailing. Their reliance on that for the same proposition is unavailing. A little further down, although the panel cited the proposition that fraud need not be shown to consider the entities as one, it did not rely on that proposition alone for its conclusion that the PSC appropriately pierced the corporate veil. The court explicitly cited some misuse of the corporate form that did occur under the circumstances. Specifically, the subsidiaries held by consumers were transferred to CMS Energy for the sole purpose of avoiding regulation of the proceeds to be generated by the sales. And the court concludes CMS Energy does not support plaintiff's position but refutes it. They also have a footnote there. We are unable to locate any binding Michigan case that has held that the corporate veil may be disregarded absent a showing of fraud, some wrongdoing, or some misuse of the corporate form. Which court was it that decided this? This was the Michigan Court of Appeals. But the Eastern District of Michigan has recognized, now recognizes that this is Michigan's law for piercing the veil. What's the purpose of establishing 14? I really don't think they can contest this. The purpose of 14 was to take title to foreclosed properties that had been pledged for loans by Huntington. That's a common banking practice. A lot of them have what they call REO subsidiaries, which take title to the land. They discuss in their briefs the myriad of transactions that result in proceeds that get swept up to Huntington. 14 Corporation was not formed solely for the purpose of this transaction, and that's their only argument that it was designed for fraud or misuse, to use the language of the CMS. You said for this transaction. Was it designed only for this type of transaction? If by this type of transaction you mean to foreclose upon mortgages, take title to property through deed in lieu, or purchase property that is to hold the title of the property, the answer is yes. That is the purpose of 14 Corporation. It's not solely to foreclose property, and it certainly wasn't solely to foreclose on junior mortgages, and it certainly wasn't solely to foreclose on the mortgages in this case. And there's evidence in the record that supports what you're saying? I don't think they would. Yes, they won't dispute it. They talk about the quarterly distribution of dividends up to Huntington National Bank. They talk about the officers being employees but not the same. There's an extensive discussion of the various elements, and it's crystal clear from the discussion that there was a lot of ongoing activity. It wasn't just this transaction. Yes, but my thinking is that it could be that hypothetically a company such as Huntington Bank could establish a subsidiary for the purpose of avoiding the RENSEN issue. It is certainly true they could do that. And would that be a fraudulent purpose if hypothetically a subsidiary was designed simply to avoid what your opponent says is the RENSEN doctrine? I understand you're saying it's a different doctrine. No, you would have to heap several additional facts on top of it. You would have to have property that is worth significantly more than the amount of debt it secures  You would have to have the inapplicability of other safeguards built into the procedure. You could get there, Your Honor, but it would require more than is present in this case. I'd like to spend a minute talking about why the sales process wasn't rigged and why they really haven't presented any compelling evidence that there is a question of fact as to the value of the property. Not that we get there. Again, this case ends with their inability to pierce the veil from 14 Corporation to Huntington National Bank. RENSEN doesn't apply. We're over. That's what Judge Bell ruled. But if the Court is interested, it is simply not true that additional bidders were prevented from bidding by virtue of the first mortgage. As you correctly pointed out, Judge Moore, the notice of foreclosure did publish the amount of the entire debt, not simply the amount of the debt that had been assigned to 14 Corporation. That is the figure that had been used beyond that. Their position is, well, we didn't know how much other debt was there, and that brings hollow for a few reasons. One, it suggests that investors willing to spend $5.5 million on a piece of property were too shy to call Huntington Bank to find out how much its mortgage secured. They acknowledge in their brief, I believe it was footnote 15 of their initial brief, that these investors were actually friends of Mr. Bosgraf, who knew or should have known how much he owed Huntington National Bank. And finally, they're fond of saying you can't cash appraisals, but you can cash checks. But they ignore the obvious corollary to that, which is you can't cash affidavits either. And what these affiants said and what they did are very different. They made no bids. They say they didn't because they were afraid to. But after the foreclosure sale, when they didn't have to worry about a first mortgage, that is, they can, and in fact one of them did, make their offer contingent on the assignment or discharge of the first mortgage, they didn't bid the $5.5 or $5.3 million claim they said they would. They bid $1.8 million, $1.88 million. They bid $2 million. They bid significantly less than 14 Corp. realized on its ultimate sale to GR Associates. Only by lumping in TIF rights and other things do they get to a higher number, and it's still less than Huntington and 14 Corp. realized together in the sale of the TIF rights and the property. These investors, supposed investors, did not present a credible position to challenge the appraisal value used by Huntington. Huntington submitted the only appraisal in any time contemporaneous. They offered no appraisal of their own. They simply tried to point to different numbers in the Huntington appraisal or poke holes at it. But that's not sufficient evidence to overcome an appraisal, as demonstrated in the Kansas City Life Insurance v. Durand case, which we cite on page 41 of our brief. They're also misstating market value from the regulation. Your Honor is correct. They've cited no authority for the applicability of that regulation to this transaction at all. They're just using it by analogy as a definition of market value. But nothing in there says there's anything unreasonable with a 12-month marketing value. That's certainly not liquidation. We're not talking about selling property in 5 minutes or 5 days. The assumption the appraisal, from the number of the appraisal relied upon, was that he had 12 months to market the property. That's hardly a liquidation value. And, again, they presented no rival appraisal. So had the court gotten past the inapplicability of Rensen, there would not have been enough to raise a question of fact as to whether 14 Corporation had bid reasonably fair value. The fact that the judge later decided an adjustment was appropriate, a $500,000 adjustment on $5 million in debt, doesn't suggest, as they say in their brief, that he affirmatively ruled they significantly underbid. There's no such finding at all. He merely decided, we contend somewhat gratuitously, that he would give the plaintiffs, debtors in this case, some additional credit. It amounted to about $300,000 after taking out. What's the basis for his picking that number? Is there a fact question? I'm sorry, I could cut you off. Well, normally on summary judgment you don't decide fact questions. That's right, you don't decide fact questions. He was wearing his hat as an equitable chancellor, and in that hat he decided, wearing that hat he decided, I will give them an adjustment in the amount of benefit that Huntington ultimately got from the sale of the property. And about that, there was no question of fact. You take the amount 14 Corp bid for it, subtract that from the amount 14 Corp sold for it, and accept as true, which appellees do not contest, that this money flowed up to Huntington Corporation. That's the benefit they obtained. There was no question of fact as to those numbers, and the analysis that he's applying in equity is that they should get the benefit that Huntington got. There's no question of fact there. The only way they create a question of fact is saying, no, the judge had to go back to the time of the sale and determine what the fair value was of the sale, and that was not a required finding in his equitable decree. Your Honors, there are a myriad of overstatements in their brief. I don't have time to address them, but if the court has any additional questions, I'd like to address those. Apparently not. Thank you. Briefly, Your Honor, it boils down to, as Mr. Raffleson acknowledged in his oral argument, it's clear that had Huntington not manipulated the process, we would not be here today. Had they allowed a fair bid process to go through, had Huntington foreclosed on the first mortgage, or 14 foreclosed on the first mortgage, we would not be here, because a fair bid process would have occurred. The only reason they foreclosed on the second, and it's cited in our brief, they admitted it in response to discovery requests, was to preclude the debtor from being able to redeem the property for the bid amount. That's why they foreclosed on the second through 14. That's their omission. It's their stated purpose, was to make sure the statutory foreclosure process was not fair. The Rensen case, as Mr. Raffleson pointed out, is designed to protect from a double recovery. In this case, if you accept Huntington's appraisal, that Mr. Raffleson referred to, it's Exhibit BBB, the appraisal says the reasonable market value, fair market value for this property, was $4.275 million. Exhibit NN, which is their appraisal, says that the brownfield tiff was worth $1.6 million. Then there was a liquor license and some minimal personal property. So Huntington's valuation of the property comes to just over $6 million. If you subtract out the $4.2 million, which they determined in their appraisal as the market value, DAGS is entitled to about $900,000. If you take our values, Exhibit SS, which states the market value of the property is $5.5, the tiff is Exhibit QQ of ours, which states that it's closer to the value of $1.9, and then you subtract out the bid process again, you come up with, we're owed about $2.5 million. So even under their philosophy, even under their numbers, they're still getting a double recovery. The fact that they fire sold the property and the judge came to the conclusion that the fire sale was the market value doesn't make it the market value. It makes it a fire sale value. The best evidence is either what people would pay for it, which are our affidavits, or what Huntington's appraiser said was the market value, the fair market value. And if you take those two numbers together, they are getting a double recovery to the tune of between $900 and $2.5 million. Now, Mr. Raffeson also pointed out that we must pierce the corporate veil. That is not true. While we set forth in our brief we have the ability to do that and we believe we've met the standard. If corporations act by setting up subsidiaries for the purpose of avoiding a statute or rule, then the courts will typically disregard the subsidiary. That's what was done in the AT&T-Mobel case. That's what was done in the CMS Energy case. That has been done over and over and over. Was the only purpose for 14 to do these kinds of transactions? Did they do anything else? They only sell, as far as the deposition testimony, they take REO property, real estate owned by the bank, when it's going into the foreclosure or deed-in-lieu process, and they sell it and then the proceeds go up to Huntington. It's a way, they said, to get the bad debt off of Huntington's books and move it to 14 and then move the cash back. So in this case, 14 was not formed for the specific purpose of avoiding a statute or rule, but it did have that effect and they used it for that purpose. And they admitted in responses to discovery that the sole purpose, they transferred the second to 14 and then foreclosed on that was to prevent Scott Bosgraf from being able to redeem the property at the bid amount. Last, it's not clear in the RENSEN case whether the mortgages were cross-collateralized, so it's difficult to say whether they were or not. It's likely that they were, as most commercial loans are, but in this case the loans were cross-collateralized, so they did secure all of the debt and the debt that was published was the 5.2, so again, taking the numbers as we presented or they presented in their appraisal, we did suffer damages that were significant. And lastly, the appraiser said the reasonable time to market this particular piece of property in his appraisal, and that's again, I mentioned the exhibit number, the appraiser said the reasonable time was 36 months, not the contrived time period that Huntington demanded that the property be sold. With no other questions, that's all I have. Okay, counsel, thank you for your arguments today. The case will be submitted, and with the remaining case being on the briefs, you may adjourn court.